# UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

|  |
| --- |
| ANTOINETTE JUDY FAMULARE, |
| Plaintiff, |
| v. |
| GANNETT CO., INC., et al. |
| Defendants. |

Civil Action No. 20-cv-13991(WJM)(MAH)

**CIVIL ACTION**

**Motion Day: February 21, 2023**

**Before Hon. William J. Martini, U.S.D.J.**

---

## PLAINTIFF'S BRIEF IN OPPOSITION TO
## MOTION FOR SUMMARY JUDGMENT

---

David Zatuchni, Esq.
*On the Brief*

**ZATUCHNI & ASSOCIATES, LLC**
287 South Main Street
(Route 29)
Lambertville, NJ 08530
(609) 243-0300

**HOPE A. LANG, ATTORNEY-AT-LAW**
912 Kinderkamack Road, Suite 3
River Edge, New Jersey 07661
(201) 599-9600

Attorneys for Plaintiffs

# TABLE OF CONTENTS

INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .1

FACTS. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

LEGAL ARGUMENT. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

I.      SUMMARY JUDGMENT STANDARD. . . . . . . . . . . . . . . . . . . . . . . . . 4

II.     MS. FAMULARE MAKES A <u>PRIMA FACIE</u> CASE OF AGE
        DISCRIMINATION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

III.    THE EVIDENCE OF PRETEXT IS OVERWHELMING, AND
        MORE THAN SUFFICIENT TO CREATE A GENUINE ISSUE
        OF MATERIAL FACT FOR A JURY . . . . . . . . . . . . . . . . . . . . . . . . . . .7

        A.      Ms. Famulare Met Her Sales Quota <u>Every</u> Quarter, Including
                The 4th Quarter of 2019, Performing Better Than Retained
                Younger Executives  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

        B.      Gannett's "Three Months In A Row" Justification . . . . . . . . . . . 13

        C.      Ms. Famulare's "Prospect Phone Calls" Are the Same As
                Retained Younger Employees, and KPI Guidelines Were
                <u>Not</u> Enforced As To Sales Executives Who Met Their Sales
                Quotas . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

        D.      Gannett's Hiring of Numerous Younger Sales Executive
                Contemporaneously with Its Termination Of Ms. Famulare
                Supports An Inference of Pretext . . . . . . . . . . . . . . . . . . . . . . . . 15

        E.      Defendant Martin's Purposeful Failure To Provide
                Ms. Famulare Notice of Impending Termination . . . . . . . . . . . .20

        F.      Further Indicia of Disparate Treatment And Targeting . . . . . . .20

                1.      Bulk Assignment of Distressed Accounts . . . . . . . . . . . . . 25

2.  Defendants Martin's Long-Standing Desire To Get Rid Of Ms. Famulare, His Oldest Sales Executive, Irrespective Of Her Sales Performance . . . . . . . . . . . . . . . . 27

3.  Ms. Famulare's Positive Performance Evaluation. . . . . . . 28

IV.  PLAINTIFF IS ENTITLED TO BRING HER PUNITIVE DAMAGES CLAIM BEFORE A JURY . . . . . . . . . . . . . . . . . . . . . . . . . .29

CONCLUSION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

# TABLE OF AUTHORITIES

## *Cases*

Anderson v. Liberty Lobby, Inc., 477 U.S. 242 (1986) . . . . . . . . . . . . . . . . . . . . . . . . . .4

Ansell v. Green Acres Contr. Co., 347 F.3d 515 (3rd Cir. 2003) . . . . . . . . . . . . . .14, 15

Bergen Commercial Bank v. Sisler, 157 N.J. 188 (1999) . . . . . . . . . . . . . . . . . . . . . .5, 6

Brown-Marshall v. Roche Diagnostics Corp., Civil No. 10-CV-5984
(D.N.J. July 19, 2013) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .30

Cavuoti v. New Jersey Transit Corporation, 161 N.J. 107 (1999). . . . . . . . . . . . . . . .29

Celotex Corp. v. Catrett, 477 U.S. 317 (1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .4

Delli Santi v CNA Ins. Co., 88 F.3d 192 (3rd Cir. 1996) . . . . . . . . . . . . . . . . . . . . . . .15

Ezold v. Wolf, 983 F.2d 509 (3rd Cir. 1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

Farrell v. Planter Lifesavers Co., 206 F.3d 271 (3rd Cir. 2000) . . . . . . . . . . . . . . . . .5, 7

Fuentes v. Perskie, 32 F.3d 759 (3rd Cir. 1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

Gaigalas v. Boehringer Ingelheim Pharmaceutical,
File No. 1:06-CV-105 (W.D. Mich. Aug. 24, 2007) . . . . . . . . . . . . . . . . . . . . . . . . . 19

Geldreich v. American Cyanamid Co., 299 N.J. Super. 478 (App. Div. 1997) . . . . . . 20

Green v. VF Jeanswear Ltd. P'ship, Case No. 10-264 (W.D. Pa. Feb. 23, 2012) . . . . 19

Gress v. Temple Univ. health Sys., Case No. 13-CV-5414
(E.D. Pa. Aug. 20, 2018) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .19

Incorvati v. Best Buy Co., Inc., Civil Case No. 10-1939 (D.N.J. June 27, 2013) . . . . .30

Keene v. Sear, Roebuch Co., Inc., Case No. 05-828 (JJH) (D.N.J. Sep. 4, 2007) . . . . 21

Lowe v. Medco Health Solutions of Willingboro, LLC, Civil Case No. 10-4823
(D.N.J. June 19, 2012) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .30

Maiorino v. Schering-Plough Corp., 310 N.J. Super. 323 (App. Div. 1997) . . . . . . . 5, 8

Marzano v. Computer Science Corp., Inc., 91 F.3d 497 (3rd Cir. 1996) . . . . . . . . . . . .8

Massarsky v. Gen. Motors Corp., 706 F.2d 111 (3rd Cir.)
cert den. 474 U.S. 937 (1983) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .5

Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 US. 574 (1986) . . . . . . . . . . 4

McCorstin v United States Steel Corp, 621 F.2d 749 (5th Cir. 1980) . . . . . . . . . . . . . .7

McCullough v. City of Atlantic City, 137 F.Supp.2d 557 (D.N.J. 2001) . . . . . . . . . . . 9

O'Connor v. Consolidated Coin Caterers Corp., 517 U.S. 308 (1996) . . . . . . . . . . . . 6

Romano v. Brown & Williamson Tobacco Corp., 284 N.J. Super. 543
(App. Div, 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .8

Savoie v. Larenceville Sch., Docket No. A-0288-10T1 (App. Div. April 12, 2013). . . . .

Smith v. Millville Rescue Squad, 225 NJ. 373 (2016) . . . . . . . . . . . . . . . . . . . . . . . . . 6

Stewart v. Rutgers, The State University, 120 F.3d 426 (3d Cir. 1997) . . . . . . . . . . . . 4

Weiss v. Parker Hannifan Corp., 747 F.Supp. 1118 (D.N.J. 1990) . . . . . . . . . . . . . . 30

Wells v. New Cherokee Corp., 58 F.3d 233 (6th Cir. 1995) . . . . . . . . . . . . . . . . . . . .21

Young v. Hobart West Group, 385 NJ. Super. 448 (App. Div. 2005) . . . . . . . . . . . . .5

Zive v. Stanley Roberts, Inc.,182 N.J. 436 (2005) . . . . . . . . . . . . . . . . . . . . . . . . .5, 6, 8

**Statutes**

Fed.R.Civ.P. 56(c) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .1

New Jersey Law Against Discrimination, 10:5-1 et seq. (LAD) . . . . . . . . . . . . . .*passim*

## INTRODUCTION

Plaintiff Antoinette Judy Famulare (previously Antoinette Mule) asserts a claim for unlawful termination on the basis of her age in violation of the New Jersey Law Against Discrimination, N.J.S.A. 10:5-1, et seq. (LAD).

Ms. Famulare was employed by Defendant Gannett Co., Inc. ("Gannett" or Defendant) and affiliated named entities as a Sales Executive. Ms. Famulare's job was to sell advertising space on local newspapers and various web-sites owned by Gannett. Ms. Famulare held this position with Gannett's predecessor corporation since 2004, and continued as a Gannett employee upon its acquisition of the business in 2016.

At Gannett, Ms. Famulare was part of sales team of Sales Executives (known as the Tri-State Team). As a salesperson, her job performance was determined by her sales quota attainment. Generally, a sales quota attainment of 80% was considered a "good number" by Gannett. Sales quotas were set on a quarterly basis.

Defendant Jeremiah Martin, in his early 40s, was made Sales Director over Ms. Famulare's sales team in 2018. Ms. Famulare was the oldest Sales Executive on the team. When she was summarily terminated on February 18, 2020 due to her age, Ms. Famulare was 63 years old.

Defendants claim that Ms. Famulare was terminated because she purportedly was not meeting her sales quotas and did not make sufficient cold prospecting phone calls given her alleged sales quota deficiency.

First, Defendants' justification is objectively, factually false. Contrary to Gannett's untruthful representations, Ms. Famulare <u>always</u> met her quarterly sales quota.

In 2018, Ms. Famulare achieved an overall quota attainment of a superlative 126%.

In 2019, Ms. Famulare's quarterly quota attainments were 94.74%, 103.06%, 102.81% and 93.27%, respectively. Her overall quota attainment in 2019 was 97.9%. By Gannett's own objective metrics, Ms. Famulare was always an excellent performer.

Notably, as shown below, Ms. Famulare's sales performance was *better* than retained younger Sales Executives.

Further, Ms. Famulare also made the same number, and substantially more, cold Prospect Calls than retained younger Sales Executives.  The Prospect Call guidelines, moreover, were not vigorously enforced, and particularly not as to Sales Executives (like Ms. Famulare) that met their sales quotas.

These indisputable facts, together with all the other evidence of pretext discussed, render Defendants' motion borderline frivolous.

Several months prior to Ms. Famulare's termination, Defendant hired a group of younger Sales Executives, all 30-35 years younger that Ms. Famulare. One of these new hires testified explicitly that he was assigned customers formerly part of Ms. Famulare's book of business.  Shortly after Ms. Famulare's termination, Defendant

Martin hired yet more younger Sales Executives, also 30-35 years younger than Ms. Famulare.

Defendant Martin also *purposely* refused to provide any notice to Ms. Famulare that he intended to terminate her for purported poor performance. Despite *specific* instructions from an HR Manager that he should place Ms. Famulare on a Performance Improvement Plan if he wanted to terminate her, he declined to do so as he had no factual basis to support such a discipline. Instead, Martin claims that he merely issued Ms. Famulare a Coaching Plan. Mr. Martin conceded that he issued such Coaching Plans "very commonly," including up to 50% of the Sales Executives under his supervision. Martin further emphasized that Coaching Plans were <u>not</u> disciplinary, were <u>not</u> used or meant to be a precursor to termination, and would <u>not</u> give a Sales Executive notice of impending discharge.

Further, before terminating Ms. Famulare, Martin took the unprecedent step of assigning her a bulk of distressed accounts in an effort to artificially raise her sales quota and attempt to set her up to fail. Nevertheless, Ms. Famulare *still* achieved a quota attainment of 93.27% in the final quarter of 2019, her last full quarter of employment.

As discussed below in more detail, the evidence of pretext in this matter is substantial, extensive, and more than sufficient to create a genuine issue of fact that must be determined by a jury.

## FACTS

Ms. Famulare incorporates herein the entirety of her Statement of Facts, And Response To Defendants' Statement of Facts, filed herewith pursuant to Local Rule 56.1.

## LEGAL ARGUMENT

## I. SUMMARY JUDGMENT STANDARD

A court should not grant summary judgment if there exist any genuine issue of material facts. Fed.R.Civ.P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 233(1986).

A court should not "… prevent a case from reaching the jury merely because the court favors one of several reasonable views of the evidence." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 US. 574, 586-87 (1986).  The judge's role is not to weigh the evidence before him in an effort to ascertain the truth of the matter presented, but to determine if there exists a genuine issue for trial. Id.

In summary judgment, a court must assume the truth of the facts presented by the non-movant, including giving that party the benefit of all favorable inferences that those facts support.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 251 (1986). "This standard is applied with added rigor in employment discrimination cases, where intent and credibility are crucial issues." Stewart v. Rutgers, The State University, 120 F.3d 426, 431 (3d Cir. 1997)(internal quotations omitted).

4

## II.   MS. FAMULARE MAKES A <u>PRIMA FACIE</u> CASE OF AGE DISCRIMINATION

Discrimination claims under the LAD are advanced under the three-step burden shifting framework.  <u>Bergen Commercial Bank v. Sisler</u>, 157 N.J. 188, 210 (1999).

First, the plaintiff must make <u>prima facie</u> claim of discrimination.  In order to do so, the plaintiff must show that (1) she was in a protected class, (2) she was performing her job at a level that met the employer's legitimate expectations, (3) she was nevertheless discharged, and (4) the adverse action took place under circumstance giving rise to an inference of unlawful discrimination. <u>See</u> <u>Young v. Hobart West Group</u>, 385 NJ. Super. 448, 463 (App. Div. 2005).

The <u>prima facie</u> case is generally "easily made out." <u>Massarsky v. Gen. Motors Corp.</u>, 706 F.2d 111, 118 (3rd Cir.) <u>cert den.</u> 474 U.S. 937 (1983); <u>Maiorino v. Schering-Plough Corp.</u>, 310 N.J. Super. 323, 346 (App. Div. 1997)("a plaintiff's burden in establishing a <u>prima facie</u> case is not onerous"); <u>see also Ezold v. Wolf</u>, 983 F.2d 509, 523 (3rd Cir. 1993).  In making out the <u>prima facie</u> case, an employee can "rely upon a broad array of evidence." <u>Farrell v. Planter Lifesavers Co.</u>, 206 F.3d 271, 283-84 (3rd Cir. 2000).  "The <u>prima facie</u> case is to be evaluated solely on the basis of the evidence presented by the plaintiff, irrespective of the defendants' efforts to dispute that evidence." <u>Zive v. Stanley Roberts, Inc.</u>,182 N.J. 436, 447-48 (2005).

Defendants do not contest that Ms. Famulare makes a prima facie case of age discrimination. Def. Brief at 8 ("For purpose of this motion only, Defendants do not assert that Plaintiff has failed to establish a *prima face* case"). In any event, Ms. Famulare easily meets each requisite element of her prima facie claim.

First, there is no dispute that at 63 years old at the time of her termination, Ms. Famulare is a member of a protected class.  Sisler, supra, 157 N.J. at 198 ("older workers form the presumptive protected class under the anti-discrimination provisions of the LAD").

Second, as Defendants concede, there is no dispute that Ms. Famulare met her employer's "legitimate expectations" for purpose of a prima facie claim.  For this prong, a plaintiff need only "produce evidence showing that she was actually performing the job prior to the termination." Zive, supra, 182 N.J. at 454.

Finally, the fourth prong can be met by an employee showing she "was replaced by someone in the same protected class, that non-protected-class workers with comparable work records were retained, or that she was terminated under circumstances giving rise to an inference of discrimination.  Smith v. Millville Rescue Squad, 225 NJ. 373, 384 (2016).  Courts have rejected the requirement that an employee has to be replaced by someone outside the protected class, as long as a younger employee is retained sufficient to support an inference of discrimination. Sisler, supra 157 N.J. at 212, citing O'Connor v. Consolidated Coin Caterers Corp.,

517 U.S. 308, 311 (1996) and <u>McCorstin v United States Steel Corp</u>, 621 F.2d 749, 754

(5th Cir. 1980)(rejecting mechanistic application of fourth element of <u>prima facie</u> in

cases of "subtle discrimination" and noting that typically in age discrimination cases, a

60-year-old will be replaced by a 55-year-old, who, in turn, is succeeded by a person in

their 40's, etc). A plaintiff can also meet her <u>prima facie</u> case from evidence that is

"gleaned from the record as a whole." <u>Farrell v. Planters Lifesavers Co.</u>, 206 F.3d 271

(3rd Cir. 2000)(same evidence can be used to meet the <u>prima facie</u> and pretext stages,

as "nothing about the <u>McDonnell Douglas</u> formula required [the court] to ration the

evidence between one stage or the other").

In addition to all the other evidence from the record as a whole discussed more

fully below, in this case there is no dispute that (1) Gannett hired multiple younger

Sales Executives contemporaneously with terminating Ms. Famulare, and (2) Gannett

retained multiple younger Sales Executives upon terminating Ms. Famulare. Jonathon

Hummel, 33 years younger that Ms. Famulare, testified that he was assigned at least

some of Ms. Famulare's accounts upon her discharge. Hummel Dep. at 14:7-19.

## III.   THE EVIDENCE OF PRETEXT IS OVERWHELMING, AND MORE THAN SUFFICIENT TO CREATE A GENUINE ISSUE OF MATERIAL FACT FOR A JURY

"The establishment of the *prima facie* case creates an inference of discrimination,

and, at that point, the matter moves to the second stage... when the burden of

production shifts to the employer to articulate a legitimate nondiscriminatory reason for the employer's action." Zive, supra, 182 N.J. at 449.

"[I]f plaintiff can then produce evidence to cast doubt on the employer's stated reason, the case should go to trial." Marzano v. Computer Science Corp., Inc., 91 F.3d 497, 509 (3rd Cir. 1996). As explained by the court, LAD claims

> center around a single question: why did the employer take an adverse action against plaintiff?  Because this is clearly a factual question, **summary judgment is in fact rarely appropriate in this type of case. Simply by pointing to evidence which calls into question the defendant's intent, the plaintiff raises an issue of material fact which if genuine is sufficient to preclude summary judgment.**
> Id. at 509-10 (citations and internal quotations omitted)(emphasis added).

The plaintiff need only raise a genuine issue of fact with regard to the employer's actual motive. Maiorino, supra, at 346; Romano v. Brown & Williamson Tobacco Corp., 284 N.J. Super. 543 551 (App. Div. 1995).  In meeting that burden, the plaintiff **need not** prove that age was the sole or exclusive consideration," rather she need only show "that it made a difference" in that decision. Sisler, 157 N.J. at 211.

Plaintiff raises a genuine issue of fact by pointing to "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable fact-finder could rationally find them 'unworthy of credence." Id., citing Fuentes v. Perskie, 32 F.3d 759, 764-65 (3rd Cir. 1994).

Summary judgment in favor of the employer in a wrongful termination claim "is improper if the complaining employee points to **some** evidence that **raises doubt** about the employer's proffered explanation for the adverse employment decision." McCullough v. City of Atlantic City, 137 F.Supp.2d 557 (D.N.J. 2001)(emphasis added).

Gannett's articulated justification for terminating Ms. Famulare is purported poor performance. Gannett states: "She was fired because she was not making quota in the fourth quarter of 2019, was on track to not make it in the first quarter of 2020 and she was not engaging in the sales prospecting activity Defendant Jeremiah had been demanding for two years." Def. Brief at 9-10.

In every material respect, the evidence is overwhelming from which a jury can find that this is a pretext. First, Defendants' justification is *objectively*, factually false with respect to Ms. Famulare meeting her sales quota. Second, Gannett engaged in the prime indicia of pretext in an age discrimination claim, i.e. disparate and more lenient treatment of similarly situated younger employees. Third, Defendant Martin *purposefully* disregarded Gannett's own employment practices, and an HR Manager's specific directive, in avoiding giving Ms. Famulare notice that she was about to be terminated for alleged performance. Fourth, at this time, Defendant Martin began hiring a slew of new Sales Executives, all in the range of 30-35 years younger than Ms. Famulare. These facts, along with other indicia of intentional targeting of Ms.

Famulare, and coupled with the numerous inconsistencies and weaknesses in the decision-makers' testimony, most certainly constitute "some" evidence more than sufficient to "raise doubt" about Defendants' intent.

### A. Ms. Famulare Met Her Sales Quota <u>Every</u> Quarter, Including The 4th Quarter of 2019, Performing Better Than Retained Younger Executives

Defendants' articulated justification that Ms. Famulare "was not making quota in the fourth quarter of 2019", her last full quarter of employment, is factually false.

The evidence in the record is that achieving <u>above 80%</u> of quota was considered a "good number" at Gannett. Taghipour Dep. at 39:12-22. In the fourth quarter of 2019, Ms. Famulare achieved quota attainment of **93.27%**. Zatuchni Cert., Exh. K. Gannett's demonstrably false justification that Ms. Famulare was deficient in her sales quota attainment in the fourth quarter of 2019 is ample basis for a jury to find pretext, and thus to deny summary judgment.

Further, Defendants elide the obviously critical fact that Ms. Famulare met her sales quota <u>every</u> quarter. For the other three (3) quarters of 2019, respectively, Ms. Famulare's attainment was **94.74%, 103.06%, and 102.81%**. For the entirety of 2019, Ms. Famulare's overall attainment was **97.9%**. Zatuchni Cert., Exh. K. In the preceding year, 2018, Ms. Famulare's overall attainment was **126%**. Zatuchni Cert., Exh. Y.

There is no reasonable dispute that, as a salesperson, Ms. Famulare's performance was fundamentally determined by the level of her meeting her sales quota. By Gannett's *own* objective quota metrics, Ms. Famulare was undisputedly an excellent performer in the last two years of her employment.

Defendant Martin clearly falsely testified that Ms. Famulare's ostensibly not meeting her sales quota was a *necessary component* to his determination that she was a poor performer. Martin Dep. at 38:-21:39:3, 130:12-17. If a jury can reasonably determine that Ms. Famulare *did* meet her quarterly sales quotas, particular in the 4th quarter of 2019, a finding of pretext is self-evident.

Defendants assertion that Ms. Famulare could not meet her sales quota in the 1st quarter of 2020 is likewise false. Denied. Ms. Famulare's quota attainment in January 2020 was 81.%, which was considered a "good number" by Gannett. Zatuchni Cert., Exh. K Taghipour Dep. at 39:14-19   Ms. Famulare was employed by Gannett for only half of February 2020 when she terminated. Martin Aff., ¶ 1. *With only a half-month of employment in February*, Ms. Famulare was still able to achieve a monthly quota attainment for February 2020 of 74.80. Zatuchni Cert., Exh. K. Ms. Famulare had every prospect of being at 100% of her quota attainment for February 2020 if she had not been terminated on February 18, 2020.

Gannett raises, but minimizes, the importance of the Gift Card that Ms. Famulare received in January 2020 as a reward for meeting her overall sales goal in

2019.  Gannett uses them specifically to show appreciation to Sales Executives for meeting sales quotas. Famulare Dep. at 86:19-24.  That Ms. Famulare was awarded such a marker of good performance at the very time that she was terminated is clearly inconsistent with and contradictory to Gannett's justification that she was not meeting sales quotas.

The inference of pretext is even stronger given that younger retained Sales Executives had substantially lower or the same sales attainment as Ms. Famulare, without any adverse employment consequences.  Elizabeth Stever's overall attainment in 2019 was only 77.19%.  Rebecca Cardena's overall attainment was 88.52%.  Celeste Frederico's overall attainment was 88.53%.  Maria Sergei's and Ann Giancaspro's attainment levels were effectively the same as Ms. Famulare at 98.45% and 99.88%, respectively.  Zatuchni Cert., Exhs. L, M, N, O, P.

HR Manager Abetamarco, despite being a "joint" decision-maker in Ms. Famulare's termination, testified that she did not bother to compare Ms. Famulare's sales goal attainment numbers to the other Sales Executive on the Team prior to terminating Ms. Famulare.  Abatemarco Dep. at 55:2-4.

> Q.    Okay. Did you go back and compare Ms. Famulare's quota attainment and compare her quota attainment going back a year, let's say, compared to her other account executives?
> A.    No.
> Abetamarco Dep. at 50:13-17
>
> Q.    So now that we're on the same page, when I say quota, I guess you call it goal attainment?

A.     Yes.

Q.     Did you ever average out Ms. Famulare's goal attainment over the preceding year and compare that to any other account executive?

A.     We look at everything month by month, quarter by quarter, and then at the end of the year we look at the annual, so that's the way we look at things.

Q.     So there's a number that provides her overall percentage for the year in terms of her goal attainment?

A.     It's available. It's available, but they're paid on month by month and quarter by quarter.

Q.     That annual figure, did you look at that and compare that for Ms. Famulare to any of the other account executives?

A.     No.

Abatemarco Dep. at 52:7-53:1.

## B.     Gannett's "Three Months In A Row" Justification

Gannett also states in its Brief that Ms. Famulare was "fired because she failed to meet her sales target for over three months…" Def. Brief at 1.  (Cynically, the "three months" Gannett is referring to are December 2019 and January and February 2020, precisely when New Jersey first started being affected by Covid-19. Zatuchni Cert., Exhs. S, T (NJ Executive Orders 102 and 103 regarding Covid-19.)

For purposes of this motion, it critical that numerous retained Sales Executives failed to meet their sales quotas three (3) months in a row by significant margins without any adverse employment action, including the *very same months* as Ms. Famulare.

**Elizabeth Stever** failed to meet her quota for three (3) months in a row in 2019 (January - 63.93%; February 75.23%, March 66.83).   Ms. Stever *again* failed to

13

meet her quota three months in a row in later 2019/January 2020 (November –
54.57%, December -  52.19%, January 2020 -77.27).  Id, Exh. L.

Ann Giancaspro also failed to meet her quota for three (3) months in a row in
2019 (September – 71.58%, October- 71.85%, November - 64.26%). Id, Exh. P.

Celeste Frederico likewise failed to meet her quota for three (3) months in a
row in 2019 (April – 78.89%, May – 56.80%, June - 51.77%).  Id, Exh. N.

Ms. Taghipour and Mr. Monaco both failed to meet their quotas in January,
February, and March 2020, overlapping the very same period as Ms. Famulare.

Joe Monaco:        Jan. 2020 – 76.81   Feb. 2020 – 42.65   March 2020 – 58.24

M. Taghipour:     Jan. 2020 – 58.28   Feb. 2020 – 56.04   March 2020 – 29.29

Zatuchni Cert., Exhs. Q, R.

It is well established that disparate or more lenient treatment of comparable
employees is strong evidence of pretext. Ansell v. Green Acres Contr. Co., 347 F.3d
515, 521 (3rd Cir. 2003)("Evidence of an employer's conduct toward other employees
has long been held relevant and admissible to show that an employer's proffered
justification is pretext"); see also Savoie v. Lawrenceville Sch., Docket No. A-0288-
10T1, *31 (App. Div. April 12, 2013) ("A plaintiff may raise a genuine factual dispute
as to pretext by producing evidence that similarly situated employees were treated
differently").  Evidence that younger employees "were treated differently from the

plaintiff under comparable circumstances is "[e]specially relevant" to whether an

employer's proffered explanation is pretextual…" Ansel, supra, 347 F.3d at 521.

In this case, the circumstances are identical. The differently treated younger

Sales Executives have the same job title, the same job duties, report to the same

management, and the same or *worse* sales number than Ms. Famulare for three months

in a row, including during precisely the same months. See Delli Santi v CNA Ins. Co.,

88 F.3d 192, 203-04 (3rd Cir. 1996)(explaining a violation of company policy can

constitute a pretext for discrimination if others similarly situated also violated the

policy with no adverse consequences).

### C.   Ms. Famulare's "Prospect Phone Calls" Are the Same As Retained Younger Employees, and KPI Guidelines Were Not Enforced As To Sales Executives Who Met Their Sales Quotas

Given that Ms. Famulare always met her quarterly sales quotas, Gannett is

effectively reduced to relying on its KPA "guidelines" of 50 Prospect Phone calls a

week.

As a threshold issue, a reasonable jury can find it highly implausible that an

employer acting in good faith would terminate a salesperson effectively at 100% of

sales quota merely on the basis of a cold call guideline.

Most significantly, however, the evidence of disparate treatment compared to

younger retained Sales Executives is again overwhelming. In 2019, Ms. Famulare

made substantially more Prospect Phone Calls than Ann Giancaspro, Gloria Udrija, and Rebecca Cardenas, all of whom suffered no adverse employment actions.

**Judy Famulare:**

1st Qrt – 259          2nd Qrt – 121          3rd Qrt – 75          4th Qrt – 83

**Ann Giancaspro:**

1st Qrt – 69          2nd Qrt – 23          3rd Qrt – 61          4th Qrt – 73

**Gloria Udrija:**

1st Qrt – 90          2nd Qrt – 100          3rd Qrt – 56          4th Qrt – 41

**Rebecca Cardenas:**

1st Qrt – 332          2nd Qrt – 14          3rd Qrt – 91          4th Qrt – 58

Zatuchni Cert., Exhs. U, V, W,  X.

Just as significantly, numerous Sales Executives testified that the 50 Prospect Phone calls guideline was not vigorously enforced by Gannett.

> Q.     And these were cold calls or to existing clients?
> A.     Cold calls.
> …
> Q.     Was there a reason why you weren't able to make the 50 calls that she put you on a plan for?
> A.     Because sometimes I just couldn't. There were just other things that would take your time away and just couldn't log that amount certain weeks. It just -- sometimes it was impossible.
> Q.     Okay. And was it possible you were busy doing other things?
> A.     Correct.
> Q.     Did you tell [the Sales Manager] that, did you say, look, you know, this goal is not realistic at certain times?
> A.     I did. Yes.
> Frederico Dep. at 28:11-29:6.

> Q.     Has your manager commented or said anything when you didn't make 50 calls on a given week?

16

> A.    Sure. And typically the reason is I was working on, you know, very large proposals that were taking up my time.
>
> Q.    So if -- and these are proposals for -- to write up work you're saying for clients?
>
> A.    Uh-huh. Yes.
>
> Q.    Okay. And those would take priority over your other work because that would immediately lead to revenue I assume, correct?
>
> A.    Yes.
>
> Stever Dep. at 18:24-19-10.

(As noted above, Ms. Famulare's quota attainment in 2019 exceeded that of both Ms. Frederico and Ms. Stever.)

    In particular, KPIs were not enforced, and not considered a performance problem, if the Sales Executive was otherwise consistently meeting their sales quota. Conor Higgins confirmed that the Prospect Phone Calls guidelines was "not set in stone" and "fluctuated." Higgins Dep. at 25:10-25.  Most significantly, Mr. Higgins testified that he would *not* be placed on a Coaching Plan for failing to meet KPI's, <u>given that he was routinely meeting his sales quota.</u>

> A.    I would say -- **I have not attained that KPI, but as I mentioned, I'm consistently over my quota.**
>
> Higgins Dep. at 24:7-8.
>
> Q.    The KPI of two new business accounts per month, that would make two times 12, that's 24. Have you signed up 24 new business accounts in the last 12 months?
>
> A.    No.
>
> Q.    **Okay. Were you put on any kind of coaching plan with respect to not achieving that particular KPI in the last year?**
>
> A.    **No.**
>
> Q.    Okay.

A.   **As I mentioned, I'm consistently achieving my quota** which is the KPIs get you there so there are different ways to, you know, achieve your quota so it's not just about one KPI.

Higgins Dep. at 24:14-25.

HR Manager Abatemarco concedes that she did not bother comparing Ms.

Famulare's documented "Prospect Calls" compared to other Sales Executives, and

felt no obligation to do so before terminating Ms. Famulare.

Q.   Okay. So I asked you whether you looked at – compared Ms. Famulare's points of contact to the other sales executives in the last six months prior to her termination and I think your answer is no to that?

A.   That's correct. No.

Abatemarco Dep. at 50:7-12.

Q.   In order to protect an older employee from age discrimination you don't see it as part of your responsibility to very carefully check their performance compared to younger employees who are not being terminated?

A.   No.

Abatemarco Dep. at 61:1-6.

Defendant Martin likewise never actually compared Ms. Famulare's Prospect Call

number to other Sales Executives, and incredibly, states that he would "not be

surprised" if Ms. Famulare's numbers exceeded others.

Q.   Would it surprise you then if looking at that spreadsheet and counting all the different calls, prospecting calls, that Judy Famulare's are comparable, the same, or even better than most of the other account executives? …

THE WITNESS:   Okay. It wouldn't surprise me. It would not surprise me…

Martin Dep. at 130:19-131:2.

18

**D.      Gannett's Hiring Of Numerous Younger Sales Executives Contemporaneously With Its Termination Of Ms. Famulare Supports An Inference of Pretext**

Defendants hired a slew of substantially younger Sales Executives both just before and after Ms. Famulare's termination.

Defendant Martin hired Conor Higgins, Brandon Ramirez, and Jonathon Hummel in late 2019, all of whom are 30-35 years younger than Ms. Famulare. Higgins Dep. at 6:14-17, 14:15-16; Martin Dep. at 40:19-22, 41:21-42:3, 43:1-9, 64:7-14; Hummel Dep. at 6:20-7:23; Zatuchni Cert., Exh. J (Defs' Interrogatory Response).

Subsequent to Ms. Famulare's termination, Defendant Martin hired Mitchell McIlhenny, Kelsey Mahan, and Val DelVera, all likewise approximately 30-35 years younger than Ms. Famulare.  Martin Dep. at 65:1-66:11; Higgins Dep. at 17:16-19:6.

Gannett's recruitment of *exclusively* substantially younger sales personnel into Ms. Famulare's sales team at the time of its adverse action against her is probative of age discrimination. Green v. VF Jeanswear Ltd. P'ship, Case No. 10-264, at 86 (W.D. Pa. Feb. 23, 2012)("the alleged recruitment of younger sales personnel is obviously probative of age discrimination"); Gaigalas v. Boehringer Ingelheim Pharmaceutical, File No. 1:06-CV-105, at *18 (W.D. Mich. Aug. 24, 2007)(evidence that "[sales manager] and the company began hiring only younger people, without significant experience in the industry" supports inference of pretext in summary judgment motion); Gress v. Temple Univ. Health Sys., Case No. 13-CV-5414, at *7 (E.D. Pa.

19

Aug. 20, 2018)("Absorption of work by younger employees can give rise to an inference of age discrimination."), see also Geldreich v. American Cyanamid Co., 299 N.J. Super. 478, 490-91 (App. Div. 1997)("A showing of preference for younger employees in a business organization may constitute circumstantial evidence of age discrimination").

### E.   Defendant Martin's Purposeful Failure To Provide Ms. Famulare Notice Of Impending Termination

As conceded by Defendant Martin himself, Gannett uses a formal Performance Improvement Plan to "provide "clear guidelines that must be achieved in order to avoid termination… you must do X by Y in order to keep your job."  Martin Dep. at 46;23-47:5; see also Martin Dep. at 46:17-18. (… "We do have performance plans and we will use those when necessary"...); Abatemarco Dep. at 39:7-16 ("with the performance plan, it's normally 60-90 days.  If they don't make it, then their job is in jeopardy").

Gannett argues that Ms. Abatemarco and Defendant Martin stated that the Performance Improvement Plan was purportedly "not mandatory," and there is no evidence in the record to the contrary. Def. Brief at 18-19.  This is false.  Contrary to the self-serving and inconsistent denials of Martin and Abatemarco, there is evidence in the record that a performance improvement plan was mandatory as the last step in progressive discipline prior to termination, and explicitly communicated to Sales

Executives as such by management. As explained by Sales Executive Celeste

Frederico,

> Q.   So take me through the steps as far as your understanding of what
>      they are.
> A.   Well, from what I understand, it's a coaching plan and then it's
>      something called a PIP, PIP. I don't know what that actually is
>      because I've never been on a PIP, and then they decide at that
>      point.
> Q.   So the steps are a coaching plan, then a PIP. A PIP usually stands
>      for performance improvement plan?
> A.   Correct.
> …
> Q.   Your understanding is that a PIP would have to be issued for you
>      before you were fired for performance?
> A.   That's my understanding.
> Frederico Dep. at 25:3-21.

Ms. Frederico testified she was *explicitly* advised of this policy by a Gannett manager.

Frederico Dep. at 25:25-26:19.

Despite Gannett's incredible assertion that Ms. Famulare was not performing

for "two years", she was never placed on any performance improvement plan by

Gannett at any time.  Martin Dep. at 49:7:9; Abatemarco Dep. at 41:9-11.  Gannett's

failure to follow its own progressive disciplinary policies as to Famulare does support

an inference of pretext.  Keene v. Sears, Roebuck Co., Inc., Case No. 05-828 (JJH), at

*5 (D.N.J. Sep. 4, 2007 ("courts have held that "an employer's failure to follow

policies and procedures and inconsistences in procedures applied by defendants can

serve as circumstantial evidence of pretext"), quoting Wells v. New Cherokee Corp.,

58 F.3d 233, 236-37 (6th Cir. 1995).

What is further particularly striking is Defendant Martin's cynicism and bad faith on the issue.  Martin declined to employ a Performance Improvement Plan for Ms. Famulare even though HR manager Abatemarco *advised him that he should do so* if he intended to terminate her.  Abatemarco Dep. at 42:18-43:19.   A reasonable jury can infer several important things from a manager's refusal to follow the recommendation of his own Human Resource department.

-        First, that Martin recognized that it was obviously absurd to place an employee with an effective 100% sales quota attainment on a PIP for alleged poor sales performance.  Putting Ms. Famulare on a PIP given her sales number would only throw into sharp relief that she was being treated differently and targeted.

-        Second, that Martin purposefully wanted to avoid Ms. Famulare being on notice that he was about to fire her, so as to preclude any ability by Ms. Famulare to forestall her discharge (e.g. by complaining to upper management, carefully documenting her compliance and performance, meeting any explicit goals in the PIP within the set time frame, etc.).

Gannett suggests that Ms. Famulare should have known she was on the cusp of termination by the (wrongly dated) Coaching Plan that Defendant Martin emailed to her in December 2019. Def. Brief at 3; <u>see</u> <u>also</u> Martin Dep. at 135:3-6.  This, however, is utterly contradicted by Martin's own extensive testimony that (1) it is "very common" for him to provide Coaching Plans to his Sales Executives, (2) his

own estimate that over 50% of his reports have been given such Coaching Plans, (3) that such Plan are <u>not</u> punitive or disciplinary, (4) that he does not even provide them to Human Resources, and (5) as *especially* emphasized by Martin, his Coaching Plan are <u>not</u> used or communicated to Sales Executives as a precursor to termination.

> Q.     Okay. But what I'm trying to get at is not the exact plan contents, but the process of putting together something that you called a coaching plan, this type of document, this is something that you did with, I don't know, **50 percent** of the people that work underneath you at any point in time?
>
> …
>
> THE WITNESS: I couldn't say.
>
> Q.     Can you give me an approximate?
>
> A.     **Maybe more**.
>
> Q.     Maybe more. Okay. So it would not be unusual for an employee to receive this, for a sales executive to at some point sit down with you with a document that looks like this?
>
> A.     Or some version of a document that looks like this. No.
>
> Q.     Okay.
>
> A.     They don't all look exactly like this document, **but yeah, it's common**. Yeah.
>
> Martin Dep. at 61:6-25
>
> A.     No. Not really. I mean we know when you get to an HR perspective, once you get to a performance plan perspective clearly you need to hang onto those, but these coaching plans are really -- you know, as I've described they're working documents. They're intended to be a tool that is used to continue to coach improvement. **I don't view them as punitive. I use them a lot.**
>
> Q.     Okay. They're not -- they're something that you typically -- when you say you use them a lot how do you mean that?
>
> A.     I mean that I very commonly employ coaching plans with sales executives who are not quite where they want to be from a performance perspective to help game-plan improvement performance. **It's very common.**
>
> Martin Dep. at 48:10-24.

23

Q.     **And you don't tell employees when you use these you're on the verge or you're getting --**

A.     **No, no. The alternative is true**. I mean for me when we lose an employee the revenue impact is significant. Like it's really significantly to the detriment, so the last thing that I want is to have to go down an employee, to have to separate from an employee because it never makes the revenue picture better. It always makes it worse. So like the last thing that I want, in fact, my language is always very, very clear when we discuss this. I put things incredibly positive and one of the reasons that I avoid as much as I possibly can performance plans is when people go on a performance plan and you have that language, that very clear language of you do not do X by Z that we're going to have, you know, a serious problem. The reason I avoid those is because I tend to find that employees shut down when that happens, **so I try to keep these very, very positive…**

Martin Dep. at 62:1-25.

Q.     **Would you give these to HR?**

A.     **No, no**. These aren't -- you know, these aren't performance plans, they're coaching plans, so they're working documents that we put together in an effort to try to work with the sales rep to improve their performance. **They're not intended to be punitive so they're not -- they're not really what you would traditionally consider HR forms. We do have performance plans and we will use those when necessary, but these were -- these were all coaching plans**.

Martin Dep. at 46:10-19; see also Martin Dep. at 47:22-48-1, 48:10-24.

As corroborated by Sales Executive Taghipour, for example:

Q.     Did Mr. Martin indicate to you that when you were on the coaching plan that your job was in jeopardy in any way?

A.     I can't recall that.

Q.     Did he indicate to you that if you don't improve what was on the coaching plan that you could be terminated at any time?

A.     No.

Taghipour Dep. at 16:24-17:6.

24

### F.      Further Indicia Of Disparate Treatment And Targeting

### 1.      Bulk Assignment Of Distressed Accounts

A reasonable jury can also infer disparate treatment and targeting of Ms.

Famulare from Martin's unprecedented assignment to her of a large group of

distressed accounts that artificially raised her sales quota.

> A.      I was given, in August of 2019, I was given a set of accounts from
> a rep who had left for medical disability, I think, of which all the
> accounts were in arrears.  It wasn't just a handful of accounts.  It
> was probably 50 to 60 on the list.
>          They were accounts that was either in arrears, was going
> out of business, and that money from that desk of business was
> actually put into my overall budget number.
> Famulare Dep. at 26:6-15

These accounts had not been tended to for many months prior to their assignment to

Ms. Famulare.  Famulare Dep. at 30:4-6; 31:10-19.

As Ms. Famulare explained, the standard practice would have been to spread

these distressed accounts around amongst the sales executives, so that no one person

would be unduly adversely affected.

> Q.      And is it your opinion that these distressed accounts should have
> been given to somebody else, not you?
> A.      I would have expected that they would have been shared so that
> no one person had to obtain the brunt of the budget numbers,
> and it wouldn't affect their numbers as much.
> Famulare Dep. at 33:21-34:2.

As testified to by other Sales Executives, such bulk assignment of numerous

distress accounts to a single Sales Executive was extraordinary.

Q.     Have you been given blocks of business added to your
       responsibilities since you joined Gannett, let's say, in the last three
       years?

A.     Meaning what?

Q.     Like you come in and you're told these 30 accounts that were
       handled by this prior account executive that's leaving are now
       yours, good luck?

A.     No, no. I haven't heard it -- maybe one or two, you know, when
       account execs have left, but no, not blocks of accounts like that,
       no. I've never taken over someone's -- what we call someone's
       desk.

Q.     Have you taken over any portion, like a substantial portion?

A.     No.

Q.     What's the most accounts that you've been compelled to take or
       added to your book of business when another account executive
       has left?

A.     Maybe three or four.

Q.     Okay.

A.     At the most.

Q.     Was your quota adjusted upwards when that happened?

A.     Yes, yes. The revenue, any revenue that was tied to that account
       was put on my desk. Uh-huh.

Q.     Have you ever heard of anybody like getting like 30 or 40 or 50 or
       more new accounts as a book of business when a prior account
       executive left?

A.     No. I never heard of that amount. No.

Q.     That would strike you as unusual?

A.     Yes.

Frederico Dep. at 20:13-21:17.


Q.     But at any point in time were you assigned some, you know,
       accounts that were previously handled by another sales executive?

A.     During my time with Gannett, yes, maybe a few accounts.

Q.     When you say a few, how many are we talking about?

A.     Maybe two or three.

Q.     You were never assigned -- so in the entire time that you worked
       for Gannett you were only assigned maybe two -- like in the range
       of two or three existing accounts, preexisting accounts?

> A.  Correct. And mostly was by my own request because I had some
>     sort of prior relationships with those accounts or they were
>     accounts I knew and I was going to build them up so I asked if I
>     could have them.

Taghipour Dep. at 11:12-12:2.

Ms. Famulare complained to Martin regarding the burden to her sales quota of being assigned so many distressed accounts.   In response, Martin only adjusted 2-3 accounts and took no other action.  Famulare Dep. at 34:6-23, 103:13-105:18.

This testimony, coupled with the timing of these assignment coming shortly before Ms. Famulare's termination, can support a reasonable inference that Defendant Martin was purposefully trying to set Ms. Famulare up for failure.

### 2.  Defendant Martin's Long-Standing Desire To Get Rid Of Ms. Famulare, His Oldest Sales Executive, Irrespective Of Her Sales Performance

Defendant Martin was made Sales Director over the Tri-State Team in 2018. Martin Dep. at 25:1-26:8, 27:8-16.  The record strongly supports the inference that Martin immediately began to display an animus against Ms. Famulare, his oldest Sales Executive, irrespective of her undisputedly excellent sales performance at the time.

In 2018, Ms. Famulare's overall sales quota attainment was a superlative 126%. Zatuchni Cert. Exh. Y.  Nevertheless, Defendant Martin was reporting to Human Resources that she was purportedly a poor performer.  Abatemarco 29:10-20: 34:9-12. Indeed, Ms. Abatemarco could not recall any other Sales Executive that Martin complained about during that time. Id., at 34:9-12.  These facts, together with Martin's

hiring spree of substantially younger Sales Executives, strongly support an inference

that 1) Martin was looking to establish a younger sales team, and (2) specifically, had

been seeking to get rid of Ms. Famulare *irrespective of her actual performance.*

### 3.    Ms. Famulare's Positive Performance Evaluation

Certainly, Ms. Famulare's last Performance Evaluation, given to her in June

2019, with a rating of "Consistently achieves Goals and Demonstrates Values

Behaviors," contradicts Gannett's articulated justification that Ms. Famulare was

terminated because she had been performing poorly for two years." Martin Dep. at

137:15-24; Zatuchni Cert., Exh. Y (Performance Evaluation).

Gannett argues that Martin's providing this evaluation to Ms. Famulare proves

that he did not have an animus against her. Def. Brief at 12-13. Given that the

Evaluation covers a period in which Ms. Famulare's quota attainment was at 126%, it

is difficult to conceive how Defendant Martin could have rationally justified anything

other than a positive rating for Ms. Famulare without appearing ludicrous.

More revealing of Defendant Martin's attitude and bad faith towards Ms.

Famulare is the testimony that, at the same time, *behind the scenes,* he was falsely

accusing Ms. Famulare of being a poor performer to Human Resources. Abatemarco

29:10-20: 34:9-12.   Also telling is Martin's deposition testimony, in which after an

initial concession, he amended his answer to insist that the evaluation rating was only

"average", again, notwithstanding Ms. Famulare's 126% quota attainment for the evaluation period. Martin Dep. at 105:12-16.

## IV.   PLAINTIFF IS ENTITLED TO BRING HER PUNITIVE DAMAGES CLAIM BEFORE A JURY

Defendants improperly seek a dismissal of Ms. Famulare's punitive damages claims *as a matter of law*. Def. Brief at 20.

A plaintiff can recover punitive damages in a claim under New Jersey's Law Against Discrimination if she can show that (1) the offending conduct was "especially egregious", and (2) there was actual participation or willful indifference to the wrongful conduct by upper management. Cavuoti v. New Jersey Transit Corporation, 161 N.J. 107, 113 (1999).

"For an employee on the second tier of management to be considered a member of 'upper management,' the employee should have either (1) broad supervisory powers over the involved employees, including the power to hire, fire, promote, and discipline, or (2) the delegated responsibility to execute the employer's policies to ensure a safe, productive and discrimination-free workplace." Id. at 129.

Defendant Martin, as the Sales Director with broad supervisory power over the Sales Managers and Sales Executives, easily meets both of the above criterion.  Ms. Abatemarco, as the HR Manager, who testified she was a "joint" decision-maker in Ms. Famulare's termination, likewise had the responsibility to execute the employer's policies and to ensure a "discrimination-free workplace."  Abatemarco Dep. at 55:2-4.

29

Defendants' request that the Court now rule on the relative maliciousness of their conduct, before a jury hearing all the testimony and making credibility determinations, is inappropriate. "Because the issue of punitive damages is a fact-sensitive question for a jury, ruling on this issue at the summary judgment stage would be premature." <u>Brown-Marshall v. Roche Diagnostics Corp.</u>, Civil No. 10-CV-5984, at *18-19 (D.N.J. July 19, 2013).  "Each of these issues is a difficult and fact-sensitive determination and, under New Jersey law, the exceptional nature of a given case and the wanton or malicious nature of the defendant's conduct are questions for the finder of fact." <u>Id.</u>, <u>citing</u> <u>Weiss v. Parker Hannifan Corp.</u>, 747 F.Supp. 1118, 1135 (D.N.J. 1990); <u>Lowe v. Medco Health Solutions of Willingboro, LLC</u>, Civil Case No. 10-4823 (D.N.J. June 19, 2012)(same); <u>Incorvati v. Best Buy Co., Inc.</u>, Civil Case No. 10-1939 (D.N.J. June 27, 2013)(same).

## CONCLUSION

For all the foregoing reasons, Plaintiff Judy Famulare respectfully requests that

Defendants' Motion for Summary Judgment be denied.

Respectfully submitted,

/s/ *David Zatuchni*

_____
David Zatuchni, Esq.
Zatuchni & Associates, LLC
287 South Main Street
(Route 29)
Lambertville, New Jersey 08530

Hope A. Lang, Attorney At Law
912 Kinderkamack Road, Suite 3
River Edge, New Jersey 07661
(201) 599-9600
Attorneys for Plaintiffs

Dated:  January 30, 2023