## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

ANTOINETTE JUDY FAMULARE,

      **Plaintiff,**

    v.

GANNETT CO., INC., GANNETT SATELLITE
INFORMATION NETWORK, LLC and
GANNETT SATELLITE INFORMATION
NETWORK, INC. d/b/a USA TODAY; USA
NETWORK; LOCALIQ, LLC; and JEREMIAH
MARTIN, individually,

      **Defendants.**

Civ. No. 2:20-CV-13991 (WJM)

**OPINION**

## WILLIAM J. MARTINI, U.S.D.J.

Before the Court is a Motion for Summary Judgment pursuant to Federal Rule of Civil Procedure 56 filed by Defendants Gannett Co., Inc., Gannett Satellite Information Network, LLC, Gannett Satellite Information Network, Inc. d/b/a USA Today; USA Network; LOCALIQ, LLC (collectively, "Gannett") and Jeremiah Martin ("Martin" or together with Gannett, "Defendants"). ECF No. 51. Plaintiff Antoinette Judy Famulare[1] ("Plaintiff" or "Famulare") filed an opposition brief, ("Opp. Br."), ECF No. 52, and Defendants filed a reply, ("Reply Br."), ECF No. 53. Having reviewed the parties' submissions, the Court decides the motions without oral argument. See Fed. R. Civ. P. 78(b); L. Civ. R. 78.1(b). For the reasons set forth below, Defendants' motion for summary judgment is **DENIED**.

### I.    FACTUAL BACKGROUND

Plaintiff was born on June 2, 1956. Pl.'s Ex. I. In October 2004, she began working as a sales executive for North Jersey Media Group ("NJMG"). Famulare Dep. 9:13-15. In this role, she sold digital and newspaper advertisements to local businesses. Pl.'s SMF ¶ 2.[2] In

---

[1] Plaintiff was previously known as Antoinette Mule. Plaintiff's Statement of Material Facts ("Pl.'s SMF") ¶ 1, ECF No. 52-1.

[2] Defendants summarily object to Plaintiff's Statement of Material Facts, arguing that that many of the facts asserted by Plaintiff are "not analyzed in her brief and thus [are neither] 'material' nor compliant with Local Rule 56.1." Reply Br. 1. Defendants' summary objection is without basis, as several facts asserted by Plaintiff are analyzed in her brief and could be considered material. As such, Defendants fail to address each paragraph of Plaintiff's statement as required under L. Civ. R. 56.1(a). To the extent Plaintiff asserts material facts in its statement that are not otherwise addressed by Defendants, they will be deemed undisputed for purposes of the summary judgment motion. *See Wierzbicki v. City of Jersey City*, No. 219CV17721, 2022 WL 3053923, at *1 n.1 (D.N.J. Aug. 2, 2022).

2016, NJMG was acquired by Gannett. Pl.'s SMF ¶ 3. Famulare continued in her role as a sales executive at Gannett at their "Bergen" location, where she was a member of a regional sales team known as the Tri-State Team. Pl.'s Ex. K; Pl.'s SMF ¶¶ 3, 7. However, Gannett began to phase in various tools, including Salesforce, to track certain performance metrics of its employees that were not previously tracked by NJMG. Famulare Dep. 12:7-13:4; Martin Aff. ¶ 3. In 2017, Martin became Famulare's direct supervisor, Defendants' Statement of Material Facts ("Defs.' SMF") ¶ 1, ECF No. 51-4, and in 2018, he was made a Sales Director over the entire Tri-State Team. Pl.'s SMF ¶¶ 9-10.

On August 8, 2018, Martin issued a "Coaching Plan" on Gannett letterhead to Famulare that listed several objectives for her sales activity, including securing at least two new business appointments per week, making 100 touchpoints with prospective leads on Thursdays, and making an additional 50 touchpoints throughout the rest of the week. Martin Aff. Ex. A. Later that month, Martin emailed the plan to Famulare, stating, "With the Q3 plan that we developed in place, I definitely want to see strong activity from you this morning. The plan includes securing 2 new business appointments each week with two subsequent Reach Audits. I've reattached the plan to ensure it's top of mind." Martin Aff. Ex. A. Famulare finished the year by attaining 126% of her year-end sales quota. Pl.'s Ex. Y.

In May 2019, Famulare received "a favorable performance review" from Martin for the period of March 2018 to March 2019, though Defendants assert the review was "largely a reflection of her quota performance in 2018[.]" Mov. Br. 12, ECF No. 51. Martin noted that Famulare "consistently achieves goals and demonstrates values/behaviors," but that she should "focus on closing at least 2 new business[es] on [digital media solutions ("DMS")] each month to ensure the growth of her client base." Martin Aff. Ex. F. A few months later, on August 16, 2019, Martin provided Famulare with a second coaching plan. Martin Aff. Ex. B. The plan again lists objectives for Famulare, including logging 50 prospecting calls by August 20th, hitting 50 touchpoints on Wednesdays and Thursdays, and securing a minimum of two new business appointments per week, among other goals. *Id.*

In September 2019, Martin began hiring several sales executives, all of whom were approximately 30 to 35 years younger than Famulare. Martin Dep. 40:19-22, 41:21-42:3, 43:1-9, 64:7-14, 67:6-7; Pl.'s Ex. J; Answer ¶ 11, ECF No. 5. Further, in the summer or fall of 2019,[3] Martin assigned to Famulare at least 18 accounts previously handled by a sales executive who had left the company.[4]

In November 2019, Martin requested from Famulare outstanding information about her sales which were due to him. In their email exchange, Martin asked Famulare to "go heavier with [her] prospecting." Martin Aff. Ex. C. He noted that she "need[ed] to begin hitting [her] sales [Key Performance Indicators]" and that developing a good lead list may serve as a catalyst. *Id.* One month later, in December 2019, Martin sent Famulare a screenshot

---

[3] As discussed *infra*, a genuine issue of material fact exists regarding the exact month of the reassignment.
[4] Famulare asserts that 50 to 60 accounts were assigned to her, Famulare Dep. 100:22-101:5, while Martin asserts that she was assigned 18 accounts, Martin Aff. ¶ 6.

of her sales activity metrics for the quarter, showing that she had logged 81 prospecting calls and 69 appointments between September 29, 2019 and December 7, 2019. Martin Aff. Ex. D. In his email to her, Martin noted that "[n]ew business development and DMS closes remain as critical today as they were when we developed your prospecting plan together in August. . . . Next week I'm looking for you to follow these steps [and] focus on hitting the level of prospecting activity that will encourage results. Ultimately, we're looking for 50 prospecting calls, 10 client-facing appointments and 3 DMS pitches each week." Martin Aff. Ex. D. However, instead of attaching the August 2019 coaching plan, Martin inadvertently attached the August 2018 coaching plan, which Martin did not become aware of until this litigation. Martin Aff. ¶ 8.

Famulare finished 2019 by attaining 97.94% of her year-end sales quota and achieving $117,931 in digital sales. Pl.'s Ex. K. In recognition of her overall and digital sales performance for that year, she was awarded two gift cards from Martin in January 2020. Famulare Dep. 86:11-89:10. However, on January 21, 2020, Martin emailed Famulare, "Your activity last week was significantly below the standards we've discussed. Only 5 prospecting calls logged and 2 appointments held. Per your previous email, are you suggesting that you had activity that could not be logged due to computer issues?" Martin Aff. Ex. E.

On February 18, 2020, Famulare was terminated by Martin and Katheline Abatemarco, a regional principal HR business partner at Gannett. Defs.' SMF ¶ 1; Abatemarco Dep. 55:2-4. At the time of her termination, Famulare was the oldest sales executive on the Tri-State Team. Pl.'s Ex. J; Pl.'s SMF ¶ 8. After her termination, Martin continued to only hire sales executives that were approximately 30 to 35 years younger than Famulare. Martin Dep. 65:1-66:14. Notably, Martin testified that since becoming Sales Director in 2018, he had not hired anyone in their fifties at the Bergen location. Martin Dep. 66:25-67:7.

## II.   PROCEDURAL HISTORY

On August 14, 2020, Famulare filed the present action asserting violations of the New Jersey Law Against Discrimination ("NJLAD"), N.J.S.A. 10:5-1 *et seq.*, against Defendants in the Superior Court of New Jersey, Law Division, Bergen County.[5] Compl., ECF No. 1-1. Defendants invoked this Court's diversity of citizenship jurisdiction under 28 U.S.C. § 1332 and timely removed the case. Notice of Removal ¶ 16, ECF No. 1. Defendants answered the complaint on October 26, 2020. ECF No. 5. After having an opportunity to develop the record through discovery, Defendants moved for summary judgment. ECF No. 51.

## III.   LEGAL STANDARD

Federal Rule of Civil Procedure 56(a) provides that summary judgment is proper when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." In deciding a motion for summary judgment, the

---

[5] Famulare specifically alleges aiding and abetting (individual) liability against Martin. Compl. ¶¶ 25-28.

Court construes all facts and inferences in the light most favorable to the non-moving party. *Boyle v. Cnty. of Allegheny Pa.*, 139 F.3d 386, 393 (3d Cir. 1998). However, the Court may not make credibility determinations, weigh the evidence, or draw legitimate inferences from the facts at this stage. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). The moving party bears the initial burden of showing the basis for its motion and identifying those portions of the record which it believes demonstrate the absence of a genuine issue of material fact— that is, the "absence of evidence to support the nonmoving party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 325 (1986). Once the moving party meets this burden, the burden shifts to the non-moving party to "come forward with specific facts showing that there is a '*genuine issue for trial*' and do more than 'simply show that there is some metaphysical doubt as to the material facts.'" *United States v. Donovan*, 661 F.3d 174, 185 (3d Cir. 2011) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986)). Furthermore, "the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson*, 477 U.S. at 247-48. "A fact is 'material' . . . if its existence or nonexistence might impact the outcome of the suit under the applicable substantive law." *Santini v. Fuentes*, 795 F.3d 410, 416 (3d Cir. 2015) (citing *Anderson*, 477 U.S. at 248). "A dispute over a material fact is 'genuine' if 'a reasonable jury could return a verdict for the nonmoving party.'" *Id.* (quoting *Anderson*, 477 U.S. at 248).

## IV. DISCUSSION

"In NJLAD actions for employment discrimination, courts generally follow Title VII precedent." *Cascina v. Hackensack Univ. Med. Ctr.*, No. CV1917571, 2021 WL 4490249, at *6 (D.N.J. Oct. 1, 2021) (first citing *Tourtellotte v. Eli Lilly & Co.*, 636 F. App'x 831, 842 (3d Cir. 2016); and then citing *Bergen Commercial Bank v. Sisler*, 723 A.2d 944, 954 (N.J. 1999)). As such, "[w]hen an employee seeks to prove an employer's discriminatory intent in an adverse employment action through circumstantial evidence, courts evaluate motions for summary judgment under the specialized burden-shifting framework set out in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973)." *Id.*

The *McDonnell Douglas* framework has three steps. "At the first step, the plaintiff-employee must establish a *prima facie* case of discrimination." *Kremp v. Wachovia Bank, N.A.*, 451 F. App'x 151, 155 (3d Cir. 2011) (citing *Sisler*, 723 A.2d at 954-55). If the plaintiff establishes a *prima facie* case, "the burden of production shifts to the defendant-employer to articulate a legitimate, non-discriminatory motive for its action." *Id.* "[I]f the defendant is able to articulate such a motive, the burden shifts back to the plaintiff to show that the articulated motive was a pretext for discrimination." *Id.* A plaintiff may defeat summary judgment by pointing "to some evidence, direct or circumstantial, from which a factfinder could reasonably either (1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action." *Fuentes v. Perskie*, 32 F.3d 759, 764 (3d Cir. 1994). While "[a]t

the summary judgment stage, a plaintiff can show pretext by either means," at trial, a "plaintiff must prove both that the asserted reason is false and that discrimination is the real reason[.]" *Catullo v. Liberty Mut. Grp., Inc.*, 510 F. App'x 178, 180 (3d Cir. 2013); *see also Greenberg v. Camden Cnty. Vocational & Tech. Sch.*, 708 A.2d 460, 466 (N.J. App. Div. 1998). "To discredit the employer's proffered reason, . . . the plaintiff cannot simply show that the employer's decision was wrong or mistaken, since the factual dispute at issue is whether discriminatory animus motivated the employer, not whether the employer is wise, shrewd, prudent, or competent." *Fuentes*, 32 F.2d at 765 (citations omitted). "Rather, the non-moving plaintiff must demonstrate such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder *could* rationally find them 'unworthy of credence,' and hence infer 'that the employer did not act for [the asserted] non-discriminatory reasons.'" *Id.* (alteration in original) (citations omitted).

## A. Prima Facie Case of Age Discrimination

"In order to establish a prima facie case of age discrimination, plaintiff must demonstrate that: (1) she belongs to a protected class; (2) she performed her job at a level that satisfied [her employer]'s legitimate expectations; (3) she was discharged; and (4) she was replaced by 'a candidate sufficiently younger to permit an inference of age discrimination.'" *Young v. Hobart W. Grp.*, 897 A.2d 1063, 1068 (N.J. App. Div. 2005) (quoting *Sisler,* 723 A.2d at 956). For purposes of their motion, Defendants do not contest that Plaintiff has established a *prima facie* case of age discrimination, Mov. Br. 8, and the Court agrees that Plaintiff has made out such a case for summary judgment purposes. Famulare is a member of a protected class, as she was 63 years old and the oldest member of her sales team at the time of her termination. *See Sisler*, 723 A.2d at 958 (collecting cases and noting that it is clear that "older workers form the presumptive protected class under the anti-age-discrimination provisions of the LAD"). Plaintiff has also met the second prong by submitting evidence showing that she was "actually performing the job prior to the termination." *Zive v. Stanley Roberts, Inc.*, 867 A.2d 1133, 1143 (N.J. 2005). Further, Plaintiff was discharged, satisfying prong three, and has shown that her accounts were given to younger hires after her termination, satisfying prong four. *See* Hummel Dep. at 14:7-19.

## B. Legitimate, Non-Discriminatory Motive

In order to address their burden at the second step of the *McDonnell Douglas* framework, Defendants assert that Famulare "was fired because she was not making quota in the fourth quarter of 2019, was on track to not make it in the first quarter of 2020 **and** she was not engaging in the sales prospecting activity that her boss, Defendant Jeramiah Martin, had been demanding of her for at least two years." Mov. Br. 9-10. In response to Famulare's assertions that other sales executives on the Tri-State Team also failed to meet their quota for three consecutive months or had lower prospecting activity than Famulare, Opp. Br. 13-16 (citing Pl.'s Exs. K, L, N, P, Q, R (quota performance); Pl's Exs. U, V, W, X (prospecting

activity)), Defendants specifically emphasize that it is the *combination* of both Famulare's sustained low quota attainment *and* her failure to log her required number of in-person meetings and prospective phone calls that led to her termination, Reply Br. 5-6 (quoting Martin Dep. 105:17-106:12). Martin testified that when "performance is poor and sales activity is significantly lacking, especially following a really significant amount of effort to drive improvement against that sales activity[,] [w]hen the two of them remain poor together, that's when it starts to become a real problem and that was the situation with Ms. Famulare." *Id.* Having asserted a legitimate, non-discriminatory motive, Defendants have met their burden at this step.

### C. Evidence of Pretext

Famulare largely relies upon Salesforce records and deposition transcripts to argue that Defendants' asserted non-discriminatory motives for her termination are pretextual. Viewing the record as a whole and drawing inferences from the facts presented in the light most favorable to Famulare, the evidence submitted—including the bulk reassignment of accounts, the lack of a performance improvement plan, and Famulare's quota attainment in the first quarter of 2020—casts a weakness on Defendants' proffered reasons for Famulare's termination such that a reasonable factfinder *could* rationally find them unworthy of credence.

#### 1. Bulk Reassignment of Accounts

In addition to her low sales prospecting activity metrics, Defendants specifically point to Famulare's failure to achieve 100% of her sales quota for three consecutive months as the reason for her termination. Mov. Br. at 1 ("[S]he was fired because she failed to meet her sales targets for over three months[.]"), 9 ("She was fired because she was not making quota in the fourth quarter of 2019 [and] was on track to not make it in the first quarter of 2020[.]"). Famulare's quota attainment percentage was 132.14% in October 2019, 69.69% in November 2019, 72.73% in December 2019, and 81.58% in January 2020. Pl.'s Ex. K. November 2019 through January 2020 is the longest period in the record during which Famulare consecutively attained below 100% of her monthly quota. Pl.'s Ex. K.

Notably, this period follows Martin's reassignment of at least 18 accounts from a former sales executive to Famulare.[6] According to the testimony of other sales executives on the Tri-State Team, sales executives typically only received two to four new accounts at most following the departure of a team member, and that the assignment of any additional accounts would be unusual. Frederico Dep. 20:13-21:17; Taghipour Dep. 11:12-12:2. Martin asserts that he assigned the accounts to Famulare because they were located in close proximity to many of her other accounts. Martin Aff. ¶ 6. He also asserts that he provided "discretionary goal relief" to Famulare's sales quota to account for the reassignment. Martin Dep. 88:3-89:3.

---

[6] Defendants cite to Famulare's initial testimony that the reassignment occurred in August 2019 to argue that there is no temporal connection between the reassignment and her deficient quota performance. Reply Br. 12. However, Famulare later testified that the accounts were reassigned in October 2019. Famulare Dep. 57:21-25; 100:22-101:1. Martin also testified that the reassignment occurred in the fall or fourth quarter of 2019. Martin Dep. 88:8, 24.

However, Famulare asserts that the accounts were in arrears because the previous employee had not serviced the accounts for eight months, and that Martin's relief was inadequate. Famulare Dep. 31:10-19; 34:3-35:21.

Based on the timing and scale of the reassignment, a reasonable fact finder could find Martin intended to use the reassignment to negatively affect Famulare's quota attainment percentage. Several genuine issues of material fact remain regarding the reassignment, including: (1) the month that the accounts were reassigned to Famulare; (2) to what extent Famulare's quota attainment goal was affected by the reassignment; (3) how much "discretionary goal relief" was provided by Martin to account for the additional accounts; and (4) whether the accounts were distressed or neglected for a period of time before they were assigned to Famulare.

### 2.  Performance Improvement Plan

There is also a genuine issue of material fact regarding whether Gannett had a policy to provide performance improvement plans ("PIPs") to its sales executives before their termination, and if so, the extent to which it was followed. *See Emmett v. Kwik Lok Corp.*, 528 F. App'x 257, 262 (3d Cir. 2013) (holding that pretext could not be inferred from lack of adherence to employer's discipline policy where evidence regarding whether the policy was mandatory or rigorously followed was not provided). Katheline Abatemarco testified first that it was not Gannett's policy to put sales executives on PIPs prior to their termination for poor performance. Abatemarco Dep. 38:21-39:1. However, she subsequently testified that "[w]hen somebody misses goals three periods in a period of time, like April, May, June, if they miss goals those three months, then normally they will go on a performance improvement plan to try to get them back to where they need to be." Abatemarco Dep. 40:24-41:3. She then confirmed that this was Gannett's "typical policy [or] typical practice[.]" Abatemarco Dep. 41:12-17. She also stated that Gannett did have a formal PIP form and that PIPs were "probably in the [company's] policy." Abatemarco Dep. 40:5-11. Additionally, another sales executive testified that she believed PIPs to be part of the company's standard policy before termination. Frederico Dep. 25:3-26:11.

According to Ms. Abatemarco's testimony, Famulare's failure to meet her sales quota for three consecutive months would "normally" warrant a PIP at Gannett "to try to get [her] back to where [she] need[s] to be." Abatemarco Dep. 40:24-41:3. However, Famulare was not placed on one before her termination, Abatemarco Dep. 41:4-11, and it is not clear from the record whether Ms. Abatemarco recommended to Martin that she be placed on one in lieu of a second coaching plan in 2019, *compare* Abatemarco Dep. 42:18-43:14, *with* Martin Dep. 142:16-143:4; 146:22-147:5. Ms. Abatemarco could not recall whether other sales executives who were terminated were given a PIP prior to their termination but did confirm that one underperforming sales executive was put on a PIP shortly before she resigned. Abatemarco Dep. 38:1-16. As such, a factfinder must resolve whether Gannett had a PIP policy in place,

7

and if so, the extent to which it was followed. *See Josey v. John R. Hollingsworth Corp.*, 996 F.2d 632, 640 (3d Cir. 1993) (holding that the origin of a company policy should be resolved by a factfinder).

### 3. Quota Attainment in First Quarter of 2020

Defendants also rely on the fact that Famulare was not on track to attain her sales quota in both February 2020 and the first quarter of 2020 in deciding to terminate her. Mov. Br. 2; Martin Dep. 140:1-6 ("[I]t was very clear . . . that goal attainment was not going to happen again in February."). At the time of her termination on February 18, 2020, Famulare had attained 74.80% of her February sales quota and 53.20% of her quota for the first quarter of 2020. Pl.'s Ex. K. While Martin testified that "there was no potential for improvement based on the level of activity that [they] were seeing" during that period, Martin Dep. 99:9-19, a reasonable factfinder could find that Famulare's achievement of approximately 75% of her monthly quota halfway through the month, along with her 53.20% achievement of her quarterly quota halfway through the quarter, contradicts part of Defendants' asserted motive for her termination.

### D. Punitive Damages

Defendants argue that even if the Court decides not to dismiss Plaintiff's NJLAD claims at this stage, the record does not support a finding of punitive damages against Defendants, and thus Plaintiff's claims for such damages should be dismissed. Mov. Br. 22-23. There are two prerequisites to the award of punitive damages in a discrimination suit under the NJLAD: "(1) actual participation in or willful indifference to the wrongful conduct on the part of upper management and (2) proof that the offending conduct is especially egregious." *Cavuoti v. New Jersey Transit Corp.*, 735 A.2d 548, 551 (N.J. 1999) (citations, alterations, and internal quotation marks omitted). These questions are "highly fact-sensitive" and whether Plaintiff alleges "the type of wanton, reckless, or malicious conduct necessary to support an award of punitive damages must ordinarily be resolved by a jury." *Hargrave v. Cnty. of Atl.*, 262 F. Supp. 2d 393, 438 (D.N.J. 2003) (collecting cases). As such, Defendants' motion on this issue is **DENIED** at this juncture.

### V. CONCLUSION

For the reasons set forth above, Defendants' motion for summary judgment is **DENIED**. An appropriate Order shall follow.

WILLIAM J. MARTINI, U.S.D.J.

Date: June 1st, 2023